UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE  DIVISION

| | | |
|---|---|---|
| CHRISTINE ST. JOHN and DEBORAH | ) | |
| SCHROEDER DYSERT, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 3:10-cv-042-RLY-WGH |
| | ) | |
| MICHAEL FRITCH, individually and in his | ) | |
| capacity as Prosecutor of Dubois County, | ) | |
| Indiana; and the STATE OF INDIANA, | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT and
DEFENDANTS' MOTION TO STRIKE AND TO HAVE FACTS DEEMED
ADMITTED**

Plaintiff, Deborah Schroeder Dysert ("Dysert") and Christine St. John ("St. John"),

were formerly employed as chief deputy prosecutor and deputy prosecutor respectively

for Dubois County, Indiana.  Defendant, Michael Fritch ("Fritch"), suspended their

employment after he learned that they had accessed and copied the computer time records

of Kurt Leinenbach, a fellow Deputy Prosecutor, whom they believed lied on his time

records and did not carry an equal workload.  Fritch ultimately terminated Dysert's and

St. John's employment.

On March 16, 2010, Dysert and St. John filed the present lawsuit against Fritch, in

his individual and official capacity as Prosecutor of Dubois County, the State of Indiana

(collectively "Defendants"), and Dubois County (which has since been dismissed).  In

1

their Second Amended Complaint, Dysert and St. John bring two federal and four state law claims. Plaintiffs' federal claims include a claim of retaliation for speaking out on a matter of public concern under 42 U.S.C. § 1983 (Count I), and a claim for gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count VI). Plaintiffs' state law claims include defamation (Count II), a violation of Indiana's whistleblower statutes (Count III), a violation of Indiana's Wage Claims Statute (Count IV), and a claim for intentional infliction of emotional distress (Count V). Defendants now move for summary judgment. For the reasons set forth below, the motion is **GRANTED** in part and **DENIED** in part.

## I.      Motion to Strike

Defendants move to strike a number of Plaintiffs' facts because they rely, in part, on Plaintiffs' counsel's affidavit, transcripts of audio records "covertly recorded by them," and a portion of the transcript from Dysert's Department of Workforce Development hearing. The vast majority of Plaintiffs' facts were not considered by the court because they were either irrelevant or immaterial. Accordingly, Defendant's Motion to Strike and to Have Facts Deemed Admitted is **DENIED as MOOT**.

## II.     Background

Fritch was elected Prosecutor for Dubois County, Indiana, in November 1998, and took office on January 1, 1999. He served three terms, and left office on January 1, 2011. (Affidavit of Michael Fritch ("Fritch Aff.") ¶¶ 3, 4, 5). Fritch hired Dysert as chief deputy prosecutor soon thereafter, and she served in that capacity until March 2010. (*Id.*

2

¶¶ 6, 8).  Fritch hired Leinenbach and St. John as deputy prosecutors in 2007.  (*Id.* ¶¶ 10, 14).  Fritch served as Leinenbach's and St. John's supervisor; however, St. John also reported to Dysert, as both were assigned the Dubois Superior Court caseload.  (*Id.* ¶¶ 11, 16). Leinenbach and Fritch shared the Circuit Court caseload.  (Deposition of Christine St. John ("St. John Dep.") at 212).  Fritch's office thus comprised of one chief deputy prosecutor, two deputy prosecutors, and six office staff.  (*Id.*; Fritch Dep. Ex. 2 (time sheet reflecting the names of the employees of the Dubois County Prosecutor's Office).

Employees of the Dubois County Prosecutor's Office report their time by two methods: (1) a time sheet that is passed around the office and submitted to the Dubois County Auditor's Office, and (2) a computer timekeeping program that is password-protected.  (*Id.* ¶ 19; Deposition of Michael Fritch ("Fritch Dep."), Ex. 2; St. John Dep. at 18, 27). On May 29, 2009, St. John wrote a letter to Fritch stating her belief that Leinenbach was not accurately reporting his time on the time sheets submitted to the Auditor's Office, complaining that Leinenbach's workload was lighter than hers, and that Leinenbach is "noticeably absent on Fridays, when a lot happens at the office, to the point that it is a running joke . . . ."  (Fritch Dep., Ex. 8).  St. John "expect[ed] a full accounting from [Fritch] regarding [Leinenbach's] time and the discrepancy in the workload and the solution."  (*Id.*).

In 2009, Fritch chose not to run for reelection; instead, he chose to run for Dubois County Superior Court Judge in the upcoming 2010 election.  (Fritch Aff. ¶ 18).  After learning of Fritch's decision, Dysert and Leinenbach both announced their plans to run

3

for the Democratic nomination for Dubois County Prosecutor.  (*Id.* ¶ 11).  Dysert

announced her candidacy in July 2009; Leinenbach announced his candidacy in August or

September 2009.  (Deposition of Deborah Dysert ("Dysert Dep.") at 121; Deposition of

Kurt Leinenbach ("Leinenbach Dep.") at 64).  St. John supported Dysert's candidacy, and

actively campaigned for her.  (St. John Dep. at 13, 210).

On October 6, 2009, St. John wrote another letter to Fritch, again complaining that

Leinenbach was not reporting his absences, and that "the distribution of time and work is

not fair and is actually, in my opinion, fraudulent and discriminatory."  (St. John Dep. Ex.

40).  In January 2010, St. John discussed her concerns about Leinenbach's absences with

Dysert, and asked her for "help."  (Dysert Dep. at 29).  During this time frame (the record

is unclear), Fritch discussed, on two separate occasions, the concerns of both St. John and

Dysert with Leinenbach in Fritch's office; specifically, that "[Leinenbach] wasn't

working enough, that [he] was taking way too much time or taking too many days off."

(Leinenbach Dep. at 70-71).  Leinenbach denied those allegations and reminded Fritch

that he was doing "a lot of work outside the office."  (*Id.* at 67).  Fritch told Leinenbach

"to make sure [he] was being very accurate" in reporting his time.  (*Id.*).

Things came to a head during three conversations amongst Dysert, St. John, and

Fritch that took place on January 25, 2010 (St. John and Fritch), February 1, 2010 (St.

John, Dysert and Fritch), and February 10, 2010 (Dysert and Fritch), the contents of

which were secretly tape recorded by Dysert and St. John.[1]  As the excerpts reflect, the
conversations were, at times, heated, as Fritch was in the middle of a felony rape trial, and
Dysert and St. John were nevertheless pushing for Fritch to investigate the accuracy of
Leinenbach's attendance records.  (Fritch Aff. ¶ 22).  Fritch explained that he would
investigate their allegations against Leinenbach after the trial concluded.  (*Id*.).  Excerpts
from these conversations are illuminating, and included in this section where appropriate.

During the January 25, 2010 conversation between St. John and Fritch, St. John's
principle complaint was Leinenbach's work load, work ethic (being "in bed with the
defense"), and his numerous absences.  (Defendants' Ex. 1C at 8, 9, 45).  St. John refused
to give Fritch the documentation she had which she claimed proved her point, and
threatened a lawsuit for sex discrimination.  (*Id*. at 28).  St. John also stated that
Leinenbach was going to lose the election "if she had anything to say about it, and now,
right now, I do."  (*Id*. at 27-28).

On February 1, 2010, St. John complained to the Dubois County Auditor, Janet
Sendelweck ("Sendelweck"), in a private conference room, that "she was being treated
unfairly concerning how many hours Kurt Leinenbach was working compared to what

---

[1] Dysert admitted to eight tape-recorded conversations with Fritch, and St. John admitted
to six, but only excerpts from three of those conversations are in evidence.  (*See* Defendants'
Exs. 1A-C; Dysert Dep. Ex. 7, Dysert's Answers to Defendants' First Set of Interrogatories, No.
18; Plaintiffs' Ex. 9, St. John's Answers to Defendants' First Set of Interrogatories, No. 15).  The
conversations were transcribed by a court reporter, and the accuracy of the transcriptions is
largely uncontested.  The parties' disagreement regarding Dysert's response to Fritch on page 63
of the February 1, 2010, conversation – "Oh" versus "No" –  is immaterial.  (*See* Plaintiffs'
Response to Defendants' Fact No. 20; *see also* Defendants' Ex. B at 63).

she had to work [and that] his caseload was lighter than hers." (Deposition of Janet Sendelweck ("Sendelweck Dep.") at 57-58). Sendelweck told St. John that she needed to document her complaint in writing, and that she would investigate her complaint per Section III. F.[2] of the County Employee Policy and Procedures Handbook. (*Id*. at 59; *see also* Sendelweck Dep. Ex. 11). She also told St. John that she needed to discuss the matter with Fritch, but that she would not do so until the trial was over. (*Id*.).

That evening, after the work day ended, Dysert and St. John confronted Fritch in his office, stating that they had evidence that Leinenbach was lying on his time sheets. (Defendants' Ex. 1B at 23). Fritch asked to see the evidence, but they refused. (*Id*.). Dysert and St. John also wanted access to Leinenbach's personal password-protected computer time records. Fritch informed them that he could not remember his administrative password to access the computer program at that time, and that he was too tired from the trial that day to assist them. (*Id*. at 52, 57). He asked them to "give [him] a break" and that he would investigate the matter the following week. (*Id*. at 52).

Dysert insisted on running the computer time records anyway. (*Id*. at 56). Fritch asked Dysert whether she had the password. She responded "no," but that she could call the county IT employee (James) to obtain it. (*Id*. at 57, 62). Although the conversation is

---

[2] That section, entitled "WHISTLEBLOWER PROTECTION," provides, in pertinent part: "It is the responsibility of an employee who is aware of conduct on the part of any employee who possibly violates Federal or State laws, or County policy, to call this conduct to the attention of his/her immediate supervisor. If the employee's immediate supervisor is not responsive . . . , the employee may report to the County Auditor. . . . After such a report is made, the immediate supervisor will ask that employee's report be put in writing." (Plaintiffs' Response in Opposition to Defendants' Motion for Judgment on the Pleadings, Ex. 1).

6

at times confusing, Fritch ultimately made it known that he wanted to be present (or do it himself) when Dysert ran the copies of Leinenbach's time records out of a concern about possible allegations of tampering given Dysert's and Leinenbach's competing campaigns. (*Id*. at 61-65). The transcribed portion of the conversation that is in evidence ends with Fritch saying that "[he] will do it and run a copy." (*Id*.). Fritch also warned Dysert that "[a]nybody messing with those things [time records] . . . is going to be let go." (*Id*. at 59-60).

Dysert testified that she forgot she had Fritch's administrative password, and found it in a folder in her desk following their conversation with Fritch. (Dysert Dep. at 76-77, 125). That same evening (February 1) Dysert and St. John used the password to access and print off selected attendance records. (Fritch Aff. ¶ 33). St. John took the records home, threw some of the records away, and provided the balance to Sendelweck in an envelope with an accompanying typewritten letter the following morning. (St. John Dep. at 173-74; Sendelweck Dep. at 63-64). St. John's letter to Sendelweck made reference to their conversation from the day before, noted her frustration with Fritch's failure to address her concerns, and stated that she was "seeking protection under the whistleblower protection subsection (f) and the non-retaliation subsection (h)" of the County Handbook. (Sendelweck Dep. Ex. 11).

St. John and Dysert met with Sendelweck and the county attorney on Friday, February 5, 2010, and requested that the State Board of Accounts audit Leinenbach's time records. (Sendelweck Dep. at 70). That afternoon, St. John and Dysert gave Sendelweck

an amended complaint with documentation.  (*Id*. at 75).  Sendelweck provided Fritch a

copy of that documentation, which included the computer time records, the following

Monday.  (*Id*. at 76-77).

On Wednesday, February 10, 2010, Fritch confronted Dysert about her accessing

Leinenbach's computer time records without his authorization.  (Defendants' Ex. 1A at

32 ("[Y]ou don't get into confidential records without talking to me or anything else.")).

Fritch informed Dysert that he did not remember giving her the administrative password,

and asked Dysert why she asked for the password if she already had it.  (*Id*.).  She

responded, "Maybe I wanted to see if you were committed to looking into what was going

on, Mike."  (*Id*.).  Fritch explained that Dysert was "rolling down a slippery slope," and

that his concern with her "ha[d] nothing to do with [Leinenbach] and his accountability."

(*Id*. at 33).  Instead, his concern arose from "the way [she] responded to direct statements

that [he] made and requests that [he] made."  (*Id*.).

Fritch ultimately suspended both Dysert and St. John, and issued the following

press release:

> On Friday, February 12, 2010, I suspended chief deputy prosecutor
> Deborah Schroeder-Dysert, and recommended termination of her
> employment to the Dubois County Board of County Commissioners.  This
> action was taken after Ms. Dysert accessed, copied and distributed
> confidential password protected personnel employee files, in violation of
> my order and after having intentionally misrepresented her ability to do so.
> This conduct by Ms. Dysert is an intolerable breach of the public trust, and
> risks the integrity of the Dubois County Prosecutor's Office.
>
> Also, on Friday, February 12, 2010, I suspended deputy prosecutor
> Christine St. John for four working days in connection with receiving and

8

accepting those same confidential personnel files.

(Defendants' Ex. 5).

Dysert later informed Fritch that she and St. John had secretly tape recorded their conversations.  (Fritch Aff. ¶ 49).

Fritch terminated Dysert on March 2, 2010.  St. John took family medical leave for stress, and was ultimately terminated.  (*Id.*; St. John Dep. at 205-07).

The investigation by the State Board of Accounts' found no wrongdoing.  (St. John Dep. at 180-81).

## III.   Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). The non-moving party, however, may not rest on mere allegations or denials in its pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.  FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson*, 477 U.S. at 249. Stated differently, only disputes over material facts – i.e., "facts that might affect the outcome of the suit under the governing law" – will preclude the entry of summary judgment. *Id.*  Disputes over immaterial or irrelevant facts will not.  *Id.* at 247-48.  When

determining whether a genuine issue of material fact exists, the court views the record and all reasonable inferences in the light most favorable to the nonmoving party. *Id.* at 255.

## IV.   Discussion

The court will first address Plaintiffs' federal claims, which include their Section 1983 retaliation claim and their Title VII gender discrimination and retaliation claims.

### A.   Federal Claims

#### 1.   Section 1983

In Count I of Plaintiffs' Second Amended Complaint, Plaintiffs allege that the State of Indiana and Fritch retaliated against them for exercising their First Amendment rights to free speech, and seek money damages and injunctive relief under 42 U.S.C. § 1983 ("Section 1983").  To state a claim under Section 1983, a plaintiff must allege: (1) that the conduct complained of was committed by a person acting under color of state law, and (2) that the conduct deprived her of rights, privileges, or immunities secured by the Constitution. *Kitzman-Kelley v. Warner*, 203 F.3d 454, 457 (7th Cir. 2000).  Before reaching those issues, the court must first address who is subject to suit under Section 1983.

##### a.   The State of Indiana & Fritch, in his Official Capacity

States, their agencies, and officials sued in their official capacities are not "persons" under Section 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  "State officers sued for damages in their official capacity are not 'persons' for

purposes of the [Section 1983] suit because they assume the identity of the government that employs them."  *Hafer v. Melo*, 502 U.S. 21, 27 (1991) (citing *Will*, 491 U.S. at 71).

Plaintiffs concede that the State is not liable under Section 1983; however, Plaintiffs contend that Fritch, in his official capacity as Dubois County Prosecutor, is a "person" subject to suit because, *inter alia*, he was acting on behalf of the County when he took the adverse actions against the Plaintiffs.  In support of their position, Plaintiffs cite *Bibbs v. Newman*, 997 F.Supp. 1174 (S.D. Ind. 1998), and its discussion of whether an Indiana prosecuting attorney is entitled to Eleventh Amendment immunity when making employment decisions.  *Id*. at 1177-81.  The relevance of this inquiry is this: states are protected by Eleventh Amendment immunity while municipalities  – which are "persons" under Section 1983 – are not.

In *Bibbs*, this district court held that a prosecuting attorney in Indiana acts as an officer of the state when hiring and firing deputy prosecuting attorneys.  *Id*. at 1181.  In reaching this conclusion, the district court considered: (1) the role of a prosecuting attorney under the Indiana constitution, (2) the relationship between a prosecuting attorney and a deputy prosecuting attorney as governed by Indiana statute, and (3) the fact that a prosecuting attorney, who is sued in his official capacity, is entitled to representation by the Attorney General of Indiana, and any judgment against the prosecutor is paid by the State of Indiana.  *Id*. at 1179-80.  Considering those factors, the district court concluded that former Marion County Prosecutor Scott Newman was entitled to Eleventh Amendment immunity for his decision to terminate deputy prosecutor

Bibbs' employment. *Id*. at 1181.

In addressing the relationship between a prosecuting attorney and a deputy prosecuting attorney as provided by Indiana statute, the district court stated:

> A prosecuting attorney is authorized to appoint deputy prosecuting attorneys. Ind. Code § 33-14-7-2. Under Indiana law the relationship is presumed to be an appointment at the will of the appointing authority, and there is no evidence here tending to show that the prosecutor's power to terminate the appointment at any time and for any reason has been limited by law.

*Id*. Plaintiffs attempt to distinguish their case from *Bibbs* by arguing that, unlike Marion County Prosecutor Scott Newman, Fritch's power to terminate his employees was limited, because Fritch applied the County Handbook to his employment decisions and submitted his vacation time and termination recommendations to the County Commissioners for their approval. According to the Plaintiffs, Fritch's actions establish that Fritch acted as a county employee when he suspended and terminated Plaintiffs from their employment.

The quoted portion of the district court's decision cited by Plaintiffs is not complete, and is taken out of context. When the district court noted that there was no evidence tending to show that the prosecutor's power to terminate a deputy prosecuting attorney has been limited, the district court meant limited "by law" – i.e., limited by Indiana law. Fritch's use of the County Handbook and his request for the County Commissioners' approval of vacation time do not show that his power to terminate his deputies has been limited by Indiana law. Rather, his reference to portions of the County Handbook and his letter to the County Commissioners asking for their approval was a

12

recognition that the County is responsible for a large part of the office's operating costs, including the deputy prosecutors' salaries and a portion of his chief deputy's salary. (Fritch Aff. ¶¶ 12, 15; Fritch Dep. Ex. 13 (Fritch noting in a letter to the County Commissioners that "because Ms. Dysert's compensation is funded, in part, by the county, this written charge is submitted pursuant to [the County Handbook]").  Moreover, with respect to Fritch's letter to the County Commissioners asking for their approval to terminate Dysert, Plaintiffs admit that the County Commissioners determined that they did not have "jurisdiction" to terminate Dysert, (*see* Plaintiffs' Response at 4), as that decision could only be made by Fritch.

Plaintiffs also suggest that Fritch waived his Eleventh Amendment immunity by taking "adverse employment actions against Plaintiffs under the guise of applying the Dubois County Handbook" and by "request[ing] approval of the Dubois County Commissioners pursuant to the Handbook prior to terminating Ms. Dysert."  (Plaintiffs' Response at 28).  The Supreme Court "will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction.'"  *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171 (1909)).  This standard is "very stringent," *Kroll v. Bd. of Trustees of Univ. of Ill.*, 934 F.2d 904, 909 (7th Cir. 1991), and the waiver must be "unequivocal," *Nelson v. La Crosse County Dist. Atty.*, 301 F.3d 820, 835 (7th Cir. 2002) (citation omitted).

The provisions of the County Handbook say nothing even tangentially related to a

13

waiver of sovereign immunity, nor would one expect to find such a provision in that document.  With a few exceptions, including one for elected officials, the County Handbook's policies and procedures apply only to County employees.  (Plaintiffs' Ex. 1 at 1).  The court therefore finds that Fritch, in his official capacity as Dubois County Prosecutor, is entitled to sovereign immunity under the Eleventh Amendment and, as a state actor, is not a "person" subject to suit for damages under Section 1983.

### b.     Injunctive Relief

Plaintiffs seek an injunction "prohibiting Prosecutor Fritch from future violations of Plaintiffs' free speech rights."  (Second Amended Complaint ¶ 41).  Plaintiffs' concede that, because Fritch is no long the elected Prosecutor of Dubois County, their claims for injunctive relief are moot.

### c.     Merits

The court now turns to Plaintiffs' Section 1983 First Amendment retaliation claim against Fritch in his individual capacity.  A prima facie case of First Amendment retaliation requires a plaintiff to show that: (1) her speech was constitutionally protected; (2) she suffered a deprivation likely to deter free speech; and (3) her speech was at least a motivating factor in the employer's action.  *George v. Walker*, 535 F.3d 535, 538 (7th Cir. 2008) (citing *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006)).  A motivating factor is not tantamount to a "but-for" factor, "but is rather a factor that motivated the defendant's actions."  *Id*. (internal quotations and citations omitted).  If the plaintiff establishes her prima facie case, the burden shifts to the defendant to show that the same

14

decision would have been made in the absence of the protected speech.  *Id*.  If the defendant carries that burden, the plaintiff must then come forward with evidence demonstrating that the defendant's proffered reasons for the employment decision were pretextual and that retaliatory animus was the real reason for the decision.  *Id*.  The elements at issue here are: (1) whether the Plaintiffs' speech is protected by the First Amendment and (2) whether Plaintiffs' speech was a factor that motivated Fritch's decision to suspend and terminate Plaintiffs from their employment.

## 1.    Speech as a Matter of Public Concern

Plaintiffs' speech is constitutionally protected only if it satisfies both elements of the test set forth in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), as refined in *Connick v. Myers*, 461 U.S. 138 (1983).  The threshold question is whether Plaintiff's speech is "fairly characterized as constituting speech on a matter of public concern."  *Connick*, 461 U.S. at 146.  If the court finds that Plaintiffs' speech is constitutionally protected, the court must determine whether "the interests of [Plaintiffs] as [] citizen[s], in commenting upon a matter of public concern, outweigh the interests of the State, as an employer, in promoting the efficiency of the public service it performs through its employees." *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 973 (7th Cir. 2000) (quoting *Connick*, 461 U.S. at 142) (internal quotations omitted).  Whether speech is constitutionally protected is a question of law.  *Sullivan v. Ramirez*, 360 F.3d 692, 698 (7th Cir. 2004).

Plaintiffs contend in conclusory fashion that their "reports of Leinenbach's allegedly fraudulent timekeeping" is a matter of public concern.  Although the court is

required to "look at each act of speech separately to see whether it touched upon a matter

of public concern," *Gray v. Lacke*, 885 F.2d 399, 411 (7th Cir. 1989), Plaintiffs do not

specify which acts of speech are at issue.  Based upon a reading of Plaintiffs' Response, it

appears that the speech at issue surrounds St. John's statements, supported by Dysert, that

Leinenbach was lying on his time sheets.  Thus, the speech at issue concerns: (1) the May

29 and October 6, 2009 letters from St. John to Fritch; (2) the conversations amongst St.

John, Dysert and Fritch which occurred on January 25, February 1, 2010, and February

10, 2010; and (3) St. John's letter to Sendelweck with accompanying documentation, later

amended, supporting her allegations.

      The court now turns to the threshold inquiry: whether Plaintiffs' speech addresses

a matter of public concern.  In answering this question, the court must evaluate the

"content, form, and context" of an employee's statement based on the record as a whole."

*Connick*, 461 U.S. at 147-48.  "Speech deals with a matter of public concern when it can

'be fairly considered as relating to any matter of political, social, or other concern to the

community,' or when it 'is a subject of legitimate news interest; that is, a subject of

general interest and of value and concern to the public.'"  *Snyder v. Phelps*, 131 S.Ct.

1207, 1216 (2011) (citations omitted).  Speech that serves only a private or personal

interest, as opposed to a community one, is not protected.  *Gustafson v. Jones*, 290 F.3d

895, 907 (7th Cir. 2002) (citing *Connick*, 461 U.S. at 146); *Cliff*, 42 F.3d at 411; *Smith v.

Fruin*, 28 F.3d 646, 651 (7th Cir. 1994).

      The evidence reflects that St. John complained to Fritch by letters dated May 29,

16

2006 and October 6, 2009.  (*See* Fritch Dep. Ex. 8; St. John Dep. Ex. 40).  In both letters, one of the issues she raised was the accuracy of Leinenbach's time sheets.  The February 1, 2010 conversation between St. John and Dysert was directed to acquiring Leinenbach's time sheets to prove their point that he was not working as much as he was reporting on his time sheets.  Moreover, St. John's letter which accompanied the documentation she submitted to Sendelweck on February 2, 2012, concerned "Leinenbach's absences in the office in 2007, 2008 and 2009."  (Sendelweck Dep. Ex. 11).

Although complaints regarding personnel matters are generally held not to be matters of public concern, "complaints containing documentation of time abuse have been held to address a matter of public concern."  *Sullivan*, 360 F.3d at 699 (holding that state employees' notations of time abuse by co-workers was a matter of public concern); *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219-20 (7th Cir. 1994) (holding that a county employee's complaints regarding a co-worker's claims for excessive mileage, involvement in partisan political activity, and failure to make required building inspections was a matter of public concern).  This is because "[c]hronic time abuse by public employees implicates the misuse of taxpayer funds."  *Sullivan*, 360 F.3d at 699. The content factor therefore weighs in favor of a determination that Plaintiffs' speech addressed a matter of public concern.

Next, the court considers the context in which the speech occurred.  This factor includes the speaker's motive. "'Motive matters to the extent that even speech on a subject that would otherwise be of interest to the public will not be protected if the

17

expression addresses only the personal effect upon the employee.'" *Spiegla v. Hull*, 371

F.3d 928, 938 (7th Cir. 2004) (quoting *Gustafson*, 290 F.3d at 908).  Stated differently,

the court's inquiry must take into account "'the point of the speech in question: was it the

employee's point to bring wrongdoing to light?  Or to raise other issues of public concern,

because they are of public concern?  Or was the point to further some purely private

interest?'" *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999) (quoting *Callaway v.*

*Hafeman*, 832 F.2d 414, 417 (7th Cir. 1987)).

   *Smith v. Fruin* is illustrative of this point.  The plaintiff in *Smith* was a non-

smoking Chicago police detective who complained that Chicago's smoke-free ordinance

was not being honored in the Area 5 Violent Crimes Section, of which he was a part.  28

F.3d at 647.  The plaintiff alleged that the police department gave him a sham

surveillance assignment as punishment for voicing his concerns about smoking in Area 5.

*Id*.  The Court of Appeals reversed the district court's denial of the defendants' motion for

summary judgment on the basis of qualified immunity, holding that because the plaintiff's

complaints about workplace smoke "were both motivated by and framed in terms of his

own interests, they did not constitute speech on a matter of public concern."  *Id*. at 652.

This was true even though the subject of the plaintiff's speech – the inhalation of second-

hand smoke – was one of public import.  *Id*. at 651.  The Court noted that the plaintiff's

complaints were "entirely personal in nature" – he did not cite any difficulties

experienced by other non-smokers, he did not purport to speak on anyone else's behalf,

the relief he requested was a smoke-free environment for himself, and he chose to raise

his concerns in private conversations with his superiors.  *Id*. at 651-52.

Similarly here, St. John's May and October 2009 letters to Fritch were entirely personal in nature.  The thrust of her complaints was that Leinenbach was being treated more favorably than her in terms of "the distribution of time and work," which, in her opinion, was "fraudulent and discriminatory."  St. John wanted "accountability" for Fritch's absences from work "and appropriate action taken."  (St. John Dep. Ex. 40; *see also* Fritch Dep. Ex. 8 (asking Fritch to address "her concerns" and that she "expect[ed] a full accounting regarding [Leinenbach's] time and the discrepancy in the workload").

St. John's January 25, 2010 conversation with Fritch again centered on her belief that Leinenbach carried a lighter caseload than she did, received more time off than she did, and "pled down" too many cases with criminal defendants.  (Defendants' Ex. 1C at 9, 45).  She informed Fritch that "[s]he was not going to put up with being discriminated against like this."  (*Id*. at 8).

Plaintiffs' February 1, 2010 conversation with Fritch revolved around Dysert's request to obtain Leinenbach's time sheets that evening to prove their case against Leinenbach to Fritch.  At no time did St. John or Dysert purport to speak on behalf of others or the public at large.  The relief they sought from Fritch was likewise individual. Interpreted in a positive light, they sought workplace equality in the Prosecutor's Office. Interpreted in a negative light, they sought to smear Leinenbach, Dysert's political foe in the Democratic primary.

Plaintiffs also chose to raise their concerns in a largely private setting.  St. John

19

wrote letters to Fritch, St. John and Dysert spoke to Fritch in his office, and ultimately, St.

John made a complaint to Sendelweck in a private conference room.  (Sendelweck Dep.

at 70) (testifying that she understood from their conversation that St. John wanted the

matter handled internally and "did not want to cause a big issue.").  The fact that the State

Board of Accounts became involved does not change the court's opinion.  Plaintiffs' own

brief highlights the private nature of St. John's speech by announcing that "[t]he matter

was not made public until Fritch made it public."  (Plaintiffs' Response at 35).

Considering, as a whole, the content, form, and context of Plaintiffs' speech, there

is sufficient reason to conclude that Plaintiffs' speech did not address a matter of public

concern.

### 2.    *Connick/Pickering* **Balancing Test/Motive**

Assuming *arguendo* that Plaintiffs' speech does qualify as a matter of public

concern under *Connick*, the court next balances their interest in commenting on a matter

of public concern against their employer's interest "'in promoting the efficiency of its

public services.'"  *Kuchenreuther*, 221 F.3d at 973 (quoting *Connick*, 103 S.Ct. at 1687).

"The Seventh Circuit recognizes a number of factors that are relevant in weighing these

competing interests, including: '(1) whether the statement would create problems in

maintaining discipline by immediate supervisors or harmony among co-workers; (2)

whether the employment relationship is one in which personal loyalty and confidence are

necessary; (3) whether the speech impeded the employee's ability to perform her

responsibilities; (4) the time, place, and manner of the speech; (5) the context in which

the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.'" *Sullivan*, 360 F.3d at 701 (quoting *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000)). "Among these factors, however, the importance of the context in which the speech takes place is always entitled to significant weight." *Id*.

In the present case, the relationship between Fritch, the elected prosecutor; Dysert, his chief deputy; and St. John, his deputy prosecuting attorney, was one in which personal loyalty and confidence are necessary. *See Bibbs*, 997 F.Supp. at 1187 ("[T]he elected prosecuting attorney is entitled to have and to insist on full confidence in the judgment and loyalty of the deputy prosecuting attorneys who are essential in carrying out his policies and responsibilities.") (citing *Americanos v. Carter*, 74 F.3d 138, 143 (7th Cir. 1996) (recognizing that the political loyalty of deputy attorneys general is "of the utmost importance" to the attorney general's confidence in them)); *Litvas v. Petka*, 711 F.2d 798, 801 (7th Cir. 1983) (holding that prosecutor was entitled to demand loyalty of assistants and could dismiss any assistant in which he lost confidence "for whatever reason"). Fritch lost confidence in St. John and Dysert as loyal employees not because of their reports of what they perceived as fraudulent timekeeping practices on the part of Leinenbach, but because of the *manner* in which they obtained the evidence to prove their allegations. Thus, the court's analysis of the *Connick/Pickering* balancing test dovetails with the issue of whether Plaintiffs' speech was a motivating factor in Fritch's decision to fire Dysert and St. John.

21

On the evening of February 1, 2010, Plaintiffs confronted Fritch after work hours demanding that he give them permission to access Leinenbach's password-protected computer attendance records. Fritch informed them that he would investigate the matter after the conclusion of his rape trial. Fritch also informed them that he wanted to be present when the records were retrieved to ally any possible allegations of tampering with files. Rather than comply with Fritch's request, Plaintiffs' accessed Leinenbach's files anyway using Fritch's password, which Dysert claims to have found in her desk that evening. Fritch learned that they accessed Leinenbach's files only after Sendelweck gave him a copy of the documents submitted to her by St. John. Fritch understandably lost confidence and trust in these employees. Although Plaintiffs maintain that they did not do anything wrong, Dysert admitted in a letter to Fritch dated February 12, 2012, that she apologized and regretted if she "misled" him when she told him she did not have the password, and "understood that [he] wanted to be present when [she and St. John] ran the records." (Defendants' Ex. 1D).

The best evidence of Fritch's motive comes from the February 10, 2010, conversation between Fritch and Dysert, in which Fritch explicitly told Dysert that his disapproval with her had "nothing to do with [Leinenbach] and his accountability." (Defendant's Ex. A at 33). Rather, his displeasure with her arose because of her "respon[se] to direct statements that [he] made and requests that [he] made." (*Id.*). This statement is trustworthy and reliable because at the time Fritch made that statement, he had no idea he was being tape-recorded by Dysert.

In sum, there is no genuine issue of material fact on whether Fritch's decision to fire St. John and Dysert was motivated in part from their speech; it was not.  Fritch fired St. John and Dysert because their acts of insubordination breached his confidence and trust.  Fritch did not violate Plaintiffs' First Amendment rights; accordingly, Plaintiffs' Section 1983 First Amendment retaliation claim must be dismissed.  *Hernandez v. City of Goshen*, 324 F.3d 535, 538 (7th Cir. 2003) (Section 1983 claim dismissed for failing to establish the violation of a constitutional right).

### 2.    Title VII Claims

In Count VI, Plaintiffs allege that Fritch discriminated against them on the basis of their sex, and retaliated against them for complaining of sex discrimination.  Plaintiffs' Title VII claims falter on a threshold issue: whether they are "employees" within the scope of Title VII protection.  Title VII excludes from its protections elected officials and those chosen by such officer "to be on such officer's personal staff, or an appointee on the policy making level or an immediate supervisor with respect to the exercise of the constitutional or legal powers of the office."  42 U.S.C. § 2000e(f).  The test for determining whether someone is an exempt "employee" under 42 U.S.C. § 2000e(f) is the same test for determining whether one is exempt from the prohibitions against politically motivated hiring and firing decisions first announced by the Supreme Court in *Elrod v. Burns*, 427 U.S. 347 (1976) and *Branti v. Finkel*, 445 U.S. 507 (1980).  *Americanos*, 74 F.3d at 144.  "The test is whether the position held by the individual authorizes, either directly or indirectly, meaningful input into governmental decisionmaking on issues

23

where there is room for principled disagreement on goals or their implementation."
*Americanos*, 74 F.3d at 141.

In *Americanos*, the Seventh Circuit applied the *Elrod/Branti* test to a white
Republican deputy attorney general who was asked to resign by the newly elected
Democratic Attorney General for the State of Indiana. 74 F.3d at 139.  The deputy
attorney general filed suit against the Attorney General and others, alleging, *inter alia*, a
violation of his First Amendment right to freedom of association.  *Id*. at 140.  The district
court granted the defendants' motion to dismiss for failure to state a claim.  *Id*.  The
Seventh Circuit affirmed, holding, as a matter of law, that the position of deputy attorney
general is a position where party affiliation could appropriately be considered, and thus,
the deputy attorney general was not an "employee" as a matter of law.  *Id*. 142, 144.

This court applied the *Elrod/Branti* test to a female deputy prosecuting attorney
who was fired by the Marion County Prosecutor for complaining privately and publicly
about the salary disparity among male and female prosecutors.  *Bibbs*, 997 F.Supp. at
1177.  The deputy prosecutor filed suit against the Prosecutor and the Office of the
Prosecutor alleging, *inter alia*, sex discrimination and a violation of her First Amendment
rights for publicly criticizing the prosecutor's office.  *Id*.  Citing *Americanos*, the court
granted the defendants' motion for summary judgment, and held that a deputy prosecuting
attorney is "an appointee on the policy making level" under 42 U.S.C. § 20003(f) and is
not an "employee" for purposes of Title VII.  *Id*. at 1185.

Plaintiffs claim it "is not a foregone conclusion that all deputy prosecutors are

24

excepted from the definition of employee under Title VII," (Plaintiffs' Response at 60), and, citing an unpublished opinion from the Northern District of Texas, argue the issue must be determined based upon the facts of the particular case.  Here, they argue, Dysert and St. John worked independently of Fritch, as they worked primarily in Superior Court, and Fritch and Leinenbach worked primarily in Circuit Court.  Plaintiffs' argument lacks merit for two reasons.  First, contrary to Plaintiffs' argument, whether a public employee is exempt is not an issue of fact; it is an issue of law.  *Bibbs*, 997 F.Supp. at 1185. Second, application of the *Elrod/Branti* test requires the court to "examine the powers inherent in a given office, rather than the actual functions of the occupant of that office performed."  *Id.* at 1184 (quoting *Americanos*, 74 F.3d at 141) (internal quotations and citation omitted).  The case law in this area is clear: a deputy prosecuting attorney is "an appointee on the policy making level" under 42 U.S.C. § 20003(f), and thus, Plaintiffs are not "employees" protected under Title VII.  Plaintiffs' Title VII sex discrimination and retaliation claims must therefore be dismissed against Fritch and the State.

### B.    State Law Claims

The court elects to take supplemental jurisdiction over the remaining state law claims because they are so related to the now-dismissed federal claims as to form part of the same case or controversy.  28 U.S.C. § 1367.  Plaintiffs' state law claims include: defamation arising out of the February 12, 2010 press release, violations of Indiana's whistleblower and Wage Claim Statutes, and intentional infliction of emotional distress.

1.      **Immunity**

a.      **Common Law**

The first issue raised is whether Fritch possesses absolute immunity from

Plaintiffs' state law tort claims under Indiana common law.  The leading case in this area

is *Foster v. Pearcy*, 387 N.E.2d 446 (Ind. 1979), *cert. denied*, 445 U.S. 960 (1980).  In

that case, the plaintiff brought a libel suit against the Marion County prosecutor and a

deputy prosecutor after the deputy prosecutor spoke with an Indianapolis Star reporter

about the criminal investigation against him.  *Id*. at 447.  The charges against the plaintiff

were later dismissed, and resubmission to the grand jury resulted in a no bill.  *Id*.  The

Indiana Supreme Court reversed the Indiana Court of Appeals, and held that, because the

prosecutor is duty-bound to keep the public informed as to his or her investigative,

administrative, and prosecutorial activities, a prosecutor enjoys absolute immunity in

carrying out these duties.  *Id*. at 449.  *See also Am. Dry Cleaning & Laundry v. State*, 725

N.E.2d 96, 99 (Ind. Ct. App. 2000) (Attorney General was acting within the scope of her

authority for commenting to the press that plaintiff was a "public enemy" and was entitled

to absolute immunity in defamation action); *Sims v. Barnes*, 689 N.E.2d 734, 736-37 (Ind.

Ct. App. 1997), *trans. den.* (1998) (prosecutor was acting within scope of his

prosecutorial authority when he made statement to press implying plaintiff made death

threats and was absolutely immune from liability in defamation action); *Davis v.*

*Zirkelbach*, 149 F.3d 614, 618 (7th Cir. 1998) (Indiana law is more generous to a

prosecutor than federal law, "because it has rejected the Supreme Court's distinction

between prosecutorial and administrative or investigative functions for purposes of immunity, as long as the prosecutor is acting within the scope of his or her authority").

Plaintiffs do not challenge the holding of *Foster* and its progeny.  Their challenges are limited to whether Fritch is entitled to absolute immunity under the Indiana Tort Claims Act (the "Act").  Accordingly, the court finds that Fritch is entitled to absolute immunity for Plaintiffs' claims arising out of the statements he made in the February 12, 2012 press release and his decision to ultimately terminate their employment, and is, therefore, not liable under the common law for Plaintiffs' state law tort claims.

### b.      Indiana Tort Claims Act

Next, the court addresses Fritch's claim to immunity under the Act.  In *Foster*, the Court noted that "the duty to inform the public can be characterized as a discretionary function" that falls within the absolute immunity afforded under the Act.  *Foster*, 387 N.E.2d at 449; IND. CODE § 34-13-3-3(7).  The Court reasoned that granting statutory immunity "will insure that the prosecutor will be able to exercise the independent judgment necessary to effectuate his duties to investigate . . . and to apprise the public of his activities."  *Id*.

Notwithstanding Indiana case precedent, Plaintiffs challenge Fritch's entitlement to immunity on a number of grounds.  First, Plantiffs invoke the "planning-operational" test – a test adopted by the Indiana Supreme Court for determining whether a governmental function is discretionary for purposes of the Act.  *See Peavler v. Bd. of Comm'rs of Monroe County*, 528 N.E.2d 40, 45-46 (Ind. 1988) (rejecting the "ministerial-

27

discretionary test" in favor of the "planning-operational test" for first time).  The test provides that governmental decisions at the planning level are entitled to immunity because such decisions involve matters of official judgment, discretion, and the weighing of alternatives, but such decisions at the operational level are not.  *City of Indianapolis v. Duffitt*, 929 N.E.2d 231, 236 (Ind. Ct. App. 2010) (citing *City of Terre Haute v. Pairsh*, 883 N.E.2d 1203, 1206 (Ind. Ct. App. 2008)).

Plaintiffs argue Fritch's decision to terminate their employment was a decision made at the operational level and thus, his decision is not entitled to immunity under the Act.  The court need not delve into the specific nuances of the "planning-operational test" because, based upon the court's review of Indiana case law, Indiana courts do not apply the standard to state prosecutors.  The standard for prosecutors, as noted above, is governed by *Foster* and its progeny.

Second, Plaintiffs argue that Fritch acted outside the scope of his employment because Fritch made intentional misrepresentations in the press release.  The scope of a prosecutor's authority turns upon the nature of the activity itself, and not on the propriety or impropriety of the act.  *Clifford v. Marion County Prosecuting Attorney*, 654 N.E.2d 805, 810 (Ind. Ct. App. 1995).  "If it is an activity in which a prosecutor may engage, i.e., within the prosecutor's general scope of authority, the activity is 'authorized' within the meaning of the Tort Claims Act, regardless of whether it was done negligently or done with improper motives."  *Id.*; *Higgason v. State*, 789 N.E.2d 22, 30 (Ind. Ct. App. 2003) ("To be within the scope of employment, the conduct must be of the same general nature

28

as that authorized, or incidental to the conduct authorized.") (quoting *Celebration Fireworks, Inc. v. Smith*, 727 N.E.2d 450, 453 (Ind. 2000))). *See also Bushong v. Williamson*, 790 N.E.2d 467, 473 (Ind. 2003) (noting that even "criminal conduct" is within the scope of employment if it originated in activities closely associated with employment relationship); *Kemezy v. Peters*, 622 N.E.2d 1296, 1298 (Ind. 1998) (noting that the "commission of an intentional criminal act" may be within an employee's scope of employment). *But see* Ind. Code § 34-13-3-3(14) ("A governmental entity or employee acting within the scope of the employee's employment is not liable if the loss results from   . . . (14) Misrepresentation if unintentional.").

Fritch's issuance of the press release regarding the suspension of Dysert and St. John arises from his duty to inform the public about the administration of his office. Indeed, his decision to suspend and ultimately terminate literally half of the prosecutors in his office was significant and newsworthy. Whether the press release contained misrepresentations is immaterial and irrelevant, but for the record and as explained below, it did not.  Because Fritch was acting within the scope of his authority in apprising the public of a significant administrative decision, he was performing a discretionary function, and thus, enjoys absolute immunity under the Indiana Tort Claims Act from liability to Plaintiffs.

Third, Plaintiffs argue that Fritch is not entitled to immunity under the Act because Fritch's February 12, 2010 press release contained false statements "made with malice and in a willful and wanton manner."  (Plaintiffs' Response at 43).  Plaintiffs' argument

29

invokes a separate section of the Act, Indiana Code Section 34-13-3-5(c) ("A lawsuit filed

against an employee personally must allege that an act or omission of the employee that

causes a loss is . . . (3) malicious; [or] (4) willful and wanton . . . .").  Malice is defined as

"an intentional, wrongful act performed against another without legal justification or

excuse."  *Higgason*, 789 N.E.2d at 29 n.5 (citing BLACK'S LAW DICTIONARY 969 (7th ed.

1999)).  Willful and wanton is defined as "'an intentional act done with reckless disregard

of the natural and probable consequence of injury to a known person under the

circumstances known to the actor at the time.'"  *Miner v. Sw. Sch. Corp.*, 755 N.E.2d

1110, 1113 (Ind. Ct. App. 2001) (quoting *Witham v. Norfolk & W. Ry. Co.*, 561 N.E.2d

484, 486 (Ind. 1990)).

   The false statements at issue center on statements made in Fritch's press release

announcing his decision to suspend Dysert (and recommend her termination) and St.

John.  As explained more fully in the section below, Fritch's characterization of Dysert's

and St. John's actions was not malicious or willful and wanton.  The statements made in

the press release were true.

   Lastly, Plaintiffs argue that Fritch is not entitled to immunity under the Act

because, by retaliating against them for whistleblowing, he committed a Class A

infraction under Indiana Code Section 36-1-8-8(d) and Indiana Code Section 4-15-10-

4(d).  IND. CODE § 34-13-3-5(c) ("A lawsuit filed against an employee personally must

allege that an act or omission of the employee that causes a loss is: (1) criminal . . . .").

Those statutory sections generally provide that a public employer may not take adverse

action against an employee of a political subdivision (Indiana Code Section 36-1-8-8(d))

or the State (Indiana Code Section 4-15-10-4(d)) for reporting a violation of federal, state,

or local ordinance.  For the reasons set forth in the following section, these sections of the

Indiana Code are not applicable.

　　　　None of the objections raised by Plaintiffs defeat Fritch's entitlement to immunity

under the common law or under the Indiana Tort Claims Act.  Fritch is therefore immune

from liability for Plaintiffs' state law tort claims, including defamation, violation of

Indiana's whistleblower statute, and intentional infliction of emotional distress.  The State

is also entitled to immunity because it had no involvement in the complained-of activity.

### 2.　　Merits

　　　　Although the court has found Fritch immune from liability, the court will address

the merits of Plaintiffs' state law tort claims for the sake of completeness.  The court will

begin with Plaintiffs' claim for defamation per se.

### a.　　Defamation

　　　　To establish a claim for defamation per se, a plaintiff must establish four elements:

(1) a communication with defamatory imputation, (2) malice, (3) publication, and (4)

damages. *Kelley v. Tanoos*, 865 N.E.2d 593, 596-97 (Ind. 2007).  "[M]alice exists when a

defendant publishes a defamatory statement 'with knowledge that it was false or with

reckless disregard of whether it was false or not.'" *Collins v. Purdue Univ.*, 703

F.Supp.2d 862, 875 (N.D. Ind. 2010) (quoting *Shepard v. Schurz Comm., Inc.*, 847

N.E.2d 219, 225 (Ind. Ct. App. 2006)).  Whether a statement is defamatory is a question

of law. *Kelley*, 865 N.E.2d at 596. Truth is an absolute defense. *Collins*, 703 F.Supp.2d at 875 (citing *Northern Indiana Pub. Serv. Co. v. Dabagia*, 721 N.E.2d 294, 301 (Ind. Ct. App. 1999)).

Plaintiffs claim that Fritch's press release contained statements that were defamatory per se because the statements imputed professional misconduct. *Id*. ("A communication is defamatory per se if it imputes: . . . misconduct in a person's trade, profession, office, or occupation"). At issue are the following three sentences taken from the press release:

> This action was taken after Ms. Dysert accessed, copied, and distributed my confidential password protected personnel employee files, in violation of my order and after having intentionally misrepresented her ability to do so. This conduct by Ms. Dysert is an intolerable breach of the public trust, and risks the integrity of the Dubois County Prosecutor's Office.

> I suspended deputy prosecutor Christine St. John for four working days in connection with receiving and accepting those same confidential files.

Plaintiffs assert the press release is false because: (1) Fritch did not order Plaintiffs not to access the employee time records; (2) Dysert did not distribute employee files; (3) the employee files were not confidential; (4) Dysert did not intentionally misrepresent her ability to run the time records; and (5) Dysert did not breach the public trust.

The undisputed facts reflect that on February 1, 2010, Fritch repeatedly asked Dysert not to print the employee time records without his presence. *See* Defendants' Ex. 1D at 63 ("I want to be here when you run it."), 64 ("[W]hy does this have to be done this second? Why can't I sit there and run it for you?"), 65 ("What I am saying is, I think it's

fair, so you aren't accused, I am not accused, nothing.  We go in and run a copy of it." . . .
"What I am saying is, I will do it and run a copy").  The fact that Fritch did not use the
term "order" is inconsequential.  A reasonable employee hearing the words used by Fritch
would have understood his request and his concerns over possible allegations of
tampering, and respected his decision.

 In addition, Dysert admits she needed a password to access the employee time
records, and, after accessing and printing them, Dysert admits she handed them to St.
John.  Notwithstanding the need for a password to access the records, Plaintiffs insist at
numerous times in their brief that the records were not confidential.  Plaintiffs'
characterization of the records defies common sense.  Were these records not
confidential, there would have been no need to seek Fritch's approval, nor the need for a
password, to access them.  In fact, if any employee from the Prosecutor's Office could
readily access another office employee's time records, there would have been no need for
the February 1, 2010 discussion at all.  Thus, Fritch's statement that the employee time
records were password-protected confidential files that Dysert did, in fact, distribute to St.
John, is not an intentional falsehood; it is true.

 Dysert also claims that she did not intentionally misrepresent her ability to run the
records.  Even if Dysert legitimately "forgot" she had the password, she found it soon
after her conversation with Fritch that evening.  Dysert never informed Fritch that she
found the password until Fritch confronted her on February 10, 2010.  Given these facts,
Fritch's belief that Dysert intentionally misrepresented the fact that she had the password

to access employee files is a reasonable interpretation of what he perceived, and is not evidence that he published the statement with knowledge of its falsity or with reckless disregard of whether it was false or not.

Finally, Dysert, as chief deputy, had a duty to respect and abide by the legitimate requests and expectations of her boss, Fritch.  Her decision to access employee password protected files over the clear objection of Fritch was not only a breach of Fritch's trust, but also a breach of the public trust – the public that she swore to serve and protect.

Fritch's statement to the press reflected negatively on Dysert and St. John, and certainly did not bode well for their professional careers.  Fritch's statements, however, were not made with malice and were, in fact, true.  Plaintiffs' defamation claim is therefore dismissed.

### b.    Whistleblower Statute

### 1.    Violation of the Whistleblower Statute

Plaintiffs' claims under Indiana's whistleblower statutes are grounded in Indiana Code Section 36-1-8-8(d) and Indiana Code Section 4-15-10-4(d).  As noted previously, these sections generally provide that a public employer may not terminate an employee for reporting in writing a violation of federal, state, or local law, or misuse of public resources.  An employer who violates this statute commits a Class A infraction.  IND. CODE § 36-1-8-8(d) (applicable to employees of a political subdivision); IND. CODE § 4-15-10-4(d) (applicable to employees of the State).  As an initial matter, Indiana Code Section 36-1-8-8 does not apply to Dysert and St. John because they are not employees of

a political subdivision; they are employees of the State of Indiana.  *See, e.g., Dysert v. Review Bd. of Indiana Dep't of Workforce Dev.*, 961 N.E.2d 68 (Ind. Ct. App. 2012) (Table), 2012 WL 10142 (Ind. Ct. App. Jan. 3, 2012) (deputy prosecutors were State employees); *Clifford*, 654 N.E.2d at 810 (holding employees of the Prosecutor's Office were acting as state employees when pursuing enforcement of support order). Accordingly, the court's analysis will focus on the applicability of Indiana Code Section 4-15-10-4.

At the time the Defendants filed their moving brief, there were no Indiana state court cases directly on point.  Fritch therefore argued that Indiana Code Section 4-15-10-4 does not create a private right of action.  In support of his argument, Fritch cited *Kodrea v. City of Kokomo*, a case in which this court, predicting Indiana law, concluded that Indiana Code Section 36-1-8-8 does not provide a private right of action. 458 F.Supp.2d 857, 874-75 (S.D. Ind. 2006).  The *Kodrea* court reasoned, *inter alia*, that the plain language of the statute limited the plaintiff's remedy to appealing any disciplinary action pursuant to the procedures set forth by statute, *id.* at 874 (citing IND. CODE § 36-1-8-8(c)), and that the public policy exception to the at-will doctrine did not apply, *id.* at 875.  Fritch argued that because Indiana Code Section 36-1-8-8 is a companion section to Indiana Code Section 4-15-10-4, the same reasoning applies.

In February of this year, the Indiana Court of Appeals issued an opinion entitled *Ogden v. Robertson* which addresses the issue at hand: whether a plaintiff may bring a whistleblower claim under Indiana Code Section 4-15-10-4 in a court of law.  962 N.E.2d

134 (Ind. Ct. App. 2012).  In *Ogden*, the Court held that before a plaintiff may bring a

cause of action under Indiana Code Section 4-15-10-4, the employee must first exhaust

his or her administrative remedies prior to seeking judicial review.  *Id*. at 144.[3]  The Court

further found that the public policy exception to the at-will employment doctrine did not

apply.  *Id*. at 146.  To hold that a claimant could seek judicial review through the common

law public policy exception rather than through the remedies provided by the statute,

reasoned the Court, would render the exhaustion of remedies requirement illusory.  *Id*.

The Court did not address the issue of whether there exists a private right of action

because, in that case, the plaintiff did not avail himself of the administrative remedies

provided by the statute.  *Id*. at 143.

      The reasoning employed in *Kodrea* and *Ogden* are largely the same.  While *Ogden*

is silent on whether Indiana Code Section 4-15-10-4 creates a private right of action, both

decisions are clear on one salient point: they require a state employee, who believes he or

she has suffered an adverse employment action for having made a report in writing

regarding the violation of law or the misuse of public resources, to use the administrative

remedies provided in the statute.

      Here, Plaintiffs did not invoke the administrative remedies cited in Indiana Code

Section 4-15-10-4(c).  Nor did Plaintiffs argue that the remedy would be inadequate or

---

[3] Specifically, the statute provides that "any state employee disciplined under this subsection is entitled to process an appeal of the disciplinary action under the procedure as set forth in IC 4-15-2-34 through IC 4-15-2-35.5."  These sections were recently repealed.  A state employee's remedy is now codified in Indiana Code Section 4-15-2.2-42.

futile.  *Odgen*, 962 N.E.2d at 144 (noting that "a party is excepted from the exhaustion of

remedies requirement when the remedy is inadequate or would be futile").  Accordingly,

because Plaintiffs failed to exhaust their administrative remedies, their whistleblower

claims must be dismissed.

### 2.        Violation of the County Handbook

Plaintiffs argue that their whistleblower claims also arise under Sections F and H

of the County Handbook.  The County Handbook, however, applied only to county

employees who were compensated soley by county funds.  (Plaintiffs' Motion for

Judgment on the Pleadings, Ex. 1 at 1).  Both Dysert and St. John were state employees,

and Dysert was paid in part by state funds.  Moreover, Fritch testified that he never

adopted the County Handbook as his official policy with regard to his deputies.  (Fritch

Aff. ¶ 17).  Accordingly, the County Handbook does not apply to their claims.

### 3.        Merits of Whistleblowing Claim

Even if Plaintiffs were entitled to bring this cause of action in this court, the

evidence in this case does not support their claims of whistleblowing under Indiana

statute or under the County Handbook.  As previously explained at length by the court in

Section III.A.1.c. of this opinion, Plaintiffs were not terminated for reporting fraudulent

activity; they were terminated for insubordination.  Plaintiffs' whistleblower claims are

dismissed.

### c.        Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress against an

employer, the plaintiff must show that the employer (1) engaged in extreme or outrageous

conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress. *See*

*Bradley v. Hall*, 720 N.E.2d 747, 752 (Ind. Ct. App. 1999) (citations omitted).  Liability is

found only for conduct that is extreme and outrageous.  Indiana courts refer to the

comments to the Restatement, Section 46:

> Liability has been found only where the conduct has been so outrageous in
> character, and so extreme in degree, as to go beyond all possible bounds of
> decency, and to be regarded as atrocious, and utterly intolerable in a
> civilized community. Generally, the case is one in which the recitation of
> the facts to an average member of the community would arouse his
> resentment against the actor, and lead him to exclaim, "Outrageous!"

RESTATEMENT (SECOND) OF TORTS § 46.

Plaintiffs contend that the effect of Fritch's press release was devastating to them.

Dysert testified she had to move to Florida because the press release "was a constant topic

of conversation" making it "difficult to live there."  (Dysert Dep. at 151).  St. John

testified that the press release caused her extreme stress and continues to upset her.  (St.

John Dep. at 53).  Plaintiffs claim that Fritch's behavior also included other acts of

outrageous conduct, such as "the bitch word" and speaking of rape victims in "a

deprecating way."  (*Id*. at 123).

There is no evidence in the record that would warrant a claim for intentional

infliction of emotional distress.  The statements in the press release were true, and

Fritch's comments regarding other women, to the extent they are true, were not directed

at them.  Accordingly, Plaintiff's claim for intentional infliction of emotional distress is

dismissed.

### d.    Wage Claims Statute

Lastly, the court addresses Dysert's claim for unpaid wages against the State.

Neither party submitted any facts in support of or in opposition to this claim.  Instead, the

parties argument is one of law – whether the State is an "employer" subject to the Wage

Claims Statute.  There is no Indiana precedent directly addressing this issue; therefore,

the court is required to predict how the Indiana Supreme Court would decide this issue.

*Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007).

The Wage Claims Statute provides, in relevant part,

[W]henever an employer separates any employee from the payroll, the unpaid wages or compensation of such employee shall become due and payable at [the] regular pay day for [the] pay period in which separation occurred . . . ."

IND. CODE § 22-2-9-2(a).  The term "employer" is defined as:

every person, firm, partnership, association, corporation, limited liability company, receiver, or other officer of any court of this state, and any agent or officer of any of the above mentioned classes, employing any person in this state.

IND. CODE § 22-2-9-1(a).

The State argues that because the statute does not include the term "State" in the

definition of employer, it is not subject to the statute.  The court does not agree for several

reasons.  First, Indiana Code Section 1-1-4-5(17) extends the definition of a "person" to

include "bodies politic and corporate."  The State of Indiana reasonably fits within the

definition of "bodies politic."  Second, no Indiana court has dismissed a Wage Claims

39

complaint against a State entity on the basis that it was not an employer under the statute. *See Hickman v. State*, 895 N.E.2d 353 (Ind. Ct. App. 2008) (affirming court's grant of summary judgment in favor of Department of Corrections because employee forfeited her accrued but unused vacation time and was estopped from arguing that forfeiture provision was unenforceable).  Third, in the context of the Wage Payment Statute, the Indiana Supreme Court held that a school corporation fit within the definition of an employer and cited a litany of Court of Appeals' cases "that assumed without specific discussion that the Wage Payment Statute applied to governmental employers."  *Naugle v. Beech Grove City Sch.*, 864 N.E.2d 1058, 1064 (Ind. 2007) (citing cases).  As the Wage Payment Statute's definition of employer is virtually identical to that for the Wage Claims Statute, (*See* Ind. Code § 22-2-5-1(a) (stating that "[e]very person, firm, corporation, limited liability company, or association, . . . doing business in Indiana, shall pay each employee at least semimonthly or biweekly . . . ."), this case is highly persuasive.  For these reasons, the court finds that were this issue before the Indiana Supreme Court, it would find that the State of Indiana is subject to the Wage Claims Statute.

The State also argues that, at the very least, it is not subject to treble damages. In support of its position, the State cites *Brownsburg Comm. Sch. Corp. v. Natare Corp.*, a case in which the Indiana Supreme Court held that "municipal corporations" are "persons" as that term is used in the Indiana Antitrust Act, but, nevertheless, are not subject to treble damages. 824 N.E.2d 336, 344 (Ind. 2005).  This same argument was raised and rejected in *Naugle*.  There, the Court held that the reasons for excluding

municipal corporations from treble damages under the Indiana Antitrust Act "do not apply to the Wage Payment Statute" because the Indiana Antitrust Act is criminal in nature, but the Wage Payment Statute is not. *Naugle*, 864 N.E.2d at 1064. The Court explained:

> At the time of the adoption of the Antitrust Act, the legislature did not contemplate the possibility that a governmental entity might commit a crime. To the contrary, governmental entities were seen as the 'victims, not perpetrators' of the acts prohibited by the provisions of the Antitrust Act in issue in *Brownsburg*. . . . Unlike the Antitrust Act, which viewed governmental entities as victims, the Wage Payment Statute clearly sees employees, public or private, as the persons to be protected. School employees rely on their wages to the same extent as private employees, and nothing in the Wage Payment Statute supports excluding them from its protection.

*Id*. This reasoning applies with equal force here. State employees rely on their wages to the same extent as privately employed persons, and nothing in the Wage Claims Statute specifically excludes them from its protection. The court therefore finds that were this issue before the Indiana Supreme Court, it would find that the State is subject to treble damages for a violation of the Indiana Wage Claims Statute. Accordingly, Dysert's claim under the Wage Claims Statute remains for trial.

### e.    Claims Against the State

To the extent Plaintiffs' state law claims were also filed against the State, Plaintiffs' claims against it are dismissed.

## V.      Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment

(Docket # 89) is **GRANTED** in part and **DENIED** in part.  Defendants' Motion is

granted with respect to Plaintiffs' First Amendment retaliation claim, Plaintiffs' Title VII

claims of gender discrimination and retaliation, and Plaintiffs' state law claims of

defamation, violation of Indiana's whistleblower statutes, and intentional infliction of

emotional distress.  Defendants' Motion is denied with respect to Dysert's claim under

the Wage Claims Statute against the State of Indiana.  In addition, Defendants' Motion to

Strike and to Have Facts Deemed Admitted (Docket # 110) is **DENIED as MOOT.**


**SO ORDERED** this  24th_  day of July 2012.


                                        _____
                                        RICHARD L. YOUNG,  CHIEF JUDGE
                                        United States District Court
                                        Southern District of Indiana


Electronic Copies to:

Brandi L. Bennett
ICE MILLER LLP
bennett@icemiller.com

Matthew T. Black
STATE OF INDIANA OFFICE OF THE ATTORNEY GENERAL
matthew.black@atg.in.gov

Laura Lee Bowker
INDIANA ATTORNEY GENERAL
laura.bowker@atg.in.gov

Mark W. Ford
ICE MILLER LLP
mark.ford@icemiller.com

Greg J. Freyberger
KAHN DEES DONOVAN & KAHN, LLP
gfreyberger@kddk.com

Thomas Eugene Mixdorf
ICE MILLER LLP
thomas.mixdorf@icemiller.com